E-FILED
Monday, 22 July, 2019  09:58:06 PM
Clerk, U.S. District Court, ILCD

LAW OFFICES OF MAUREEN GRAVES
Maureen R. Graves (Illinois Bar #6311493)
1326 East Madison Park
Chicago, IL 60615
Phone: 949-466-4248
Fax: 949-856-0168

Attorney for the Plaintiffs,

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| D.W., a minor, and S.W. and K.W., individually and as parents and next friends, <br><br> Plaintiffs, <br><br> v. <br><br> MAHOMET-SEYMOUR COMMUNITY SCHOOL DISTRICT NO 3, the ILLINOIS STATE BOARD OF EDUCATION, and CHRISTINE NORTHRUP, <br><br> Defendants | Case No. 2:19-cv-2195 <br><br> **COMPLAINT** <br><br> 20 U.S.C. § 1415(i)(3) <br> 29 U.S.C. § 794 <br> 42 U.S.C. § 1983 <br><br> JURY TRIAL DEMANDED as to Rehabilitation Act Claim and § 1983 Claims |

## COMPLAINT

1.      D.W., a minor, and S.W. and K.W., individually and as parents and next friends of D.W. (Plaintiffs), by and through undersigned counsel, state the following in their complaint against Defendants, the Illinois State Board of Education, and Mahomet-Seymour Community School District No 3 (District or Defendants):

## INTRODUCTION

2.      D.W., a minor, and S.W. and K.W., individually and as parents and next friends of D.W. bring this action, which has two aspects: a request for reversal of a hearing officer's

decision under the Individuals with Disabilities Education Improvement Act (IDEA), 20 U.S.C. § 1415(i)(3), and a plea for damages for disability-based discrimination pursuant to Section 504 of the Rehabilitation Act of 1974, 29 U.S.C. § 794.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the claims for administrative review arise under the IDEA and its implementing regulations, 34 C.F.R. § 300.500 *et seq.*

4.      Venue is proper pursuant to 28 U.S.C. § 1391(b), because the parties reside in this judicial district and the events giving rise to the claim for relief occurred in this judicial district. The due process hearing in Illinois State Board of Education (ISBE) Case No. 2019-0199, decided by Impartial Hearing Office Mary Jo Strusz, occurred in this judicial district.

## PARTIES

5.      Plaintiffs, S.W. and K.W. are residents of Champaign County, Illinois, and are the adoptive parents and legal guardians of D.W., a minor.

6.      Defendant, Mahomet-Seymour Community School District No. 3 (District), headquartered in Mahomet, IL, is a public school district organized under and operating pursuant to the Illinois School Code (105 ILCS 5/1-1 *et seq.*). The Board of Education is the governing body of the District and is responsible for maintaining the schools within the District's jurisdiction, as well as the education of students in the District.

7.      Defendant, the Illinois State Board of Education (ISBE), headquartered in Springfield, Illinois, is an Illinois state agency responsible for the general oversight and administration of all public schools in the State of Illinois. It is also the agency responsible for implementing IDEA in the State of Illinois and for providing due process hearings and

administrative records from such hearings.

8.     Defendant Christine Northrup has been the special education director for the District throughout D.W.'s time in the District. She played a key role in the events in controversy and is being sued in her individual as well as official capacities.

## FACTUAL BACKGROUND

9.     D.W., who is eleven years old, was adopted by his maternal great uncle and great aunt, and most recently attended school at his home school, Lincoln Trail Elementary School in Mahomet, Illinois, where he is still a registered student but has not been allowed to attend since January 24, 2019. He is currently in the middle of what should be the summer between fourth and fifth grade, and despite qualifying for special education extended school year (summer) services each year, he is currently receiving no educational services with the exception of tutoring and counselling. His parents fund counselling. The District is not providing any services pursuant to a current IEP, though he is receiving some tutoring under a settlement agreement.

10.     D.W. has received multiple and in some cases disputed diagnoses; it appears clear that he has mild cognitive neurobiological disorder, developmental coordination disorder, specific learning disabilities in reading and writing, ADHD combined type (inattention and hyperactivity), unspecified anxiety disorder, and prenatal exposure to alcohol and drugs.

11.     D.W. is part of a loving family. He has friends in his church and neighborhood and has zero instances of physically aggressive behavior at home, in the community, or (with the exception of one encounter which seems to have been an accidental bump) with peers in school. He has never been psychiatrically hospitalized nor has he spent time away from his parents.

12.     D.W. is eligible for special education services pursuant to IDEA and has an Individualized Education Program ("IEP").

13.     D.W. received preschool special education services from his home school district, Mahomet-Seymour Community School District No. 3, beginning at age three, and has consistently been in inclusive settings, beginning with a blended preschool program and continuing into general education for kindergarten (which he repeated) as well as first and second grades. His performance has fluctuated depending on the appropriateness of instruction and behavioral supports. Starting in third grade, the District greatly aggravated D.W.'s behavioral difficulties by responding to them with increasingly complex and unpredictable schedules, removal from general education and, for many days, removal from school altogether.

14.     During his first year in kindergarten, the 2013-14 school year, D.W. struggled with academics (reading at below the 10th percentile) and with self-regulation. Because D.W. was throwing items to the floor, throwing everything off of his desk, and running out of the classroom, his parents requested a Functional Behavior Analysis and further assessments to see whether D.W. qualified for additional special education services beyond the speech and language therapy-only IEP which had been in place since 2011-12.

15.     D.W. was restrained over 20 times by numerous school staff in his first year of kindergarten for behaviors such as throwing everything off his desk and running out of the classroom.

16.     In May 2014, near the end of his first time in kindergarten, D.W. was found eligible for special education services under the category developmental delay, and a new IEP and Behavior Intervention Plan ("BIP") were written.

17.     In May 2014, concerned for D.W.'s safety and social emotional growth, his parents placed him in weekly private counseling with a Licensed Social Worker—a service which has been continuous throughout his school career. D.W.'s private therapist has attended

several IEP meetings, but the District has consistently failed to collaborate with private therapists despite family permission to do so.

18.     During D.W.'s second year of kindergarten, the 2014-15 school year, with special education supports in place and a different teaching style, D.W. was physically restrained only once or twice.

19.     In first grade, the 2015-16 school year, D.W. again struggled academically, making little progress in math and none in reading.

20.     During first grade, the District resumed frequent use of physical restraints. D.W. was physically restrained over 20 times for behaviors such as throwing everything off of his desk, stomping on crayons to break them, attempting to run out of the classroom and refusing to complete worksheets or comply with directions.

21.     During first grade, D.W. began hiding under his desk and developed severe anxiety as a result of the numerous physical restraints.

22.     Due to severe anxiety related to school D.W. began taking an anti-anxiety medication, Buspar, at the beginning of 2nd grade, the 2016-17 school year. Shortly thereafter he began taking Guanfacine for ADHD symptoms.

23.     According to District records, D.W. initially thrived socially and made significant academic progress in both math and reading during second grade.

24.     During February and March 2017, D.W. was restrained several times for such things as ripping up his worksheet, refusing to wear his coat at recess, and responding to discipline by attempting to kick, hit, punch, bite and throw items.

25.     D.W. was suspended for his reactions when being physically restrained.

26.     Parents requested multiple IEP meetings to address the return of previous

behaviors, new behaviors, and the anxiety D.W. was exhibiting.

27.     On March 31, 2017 D.W. was suspended for one day, to be served on April 3, 2017, for throwing a piece of pea gravel at his second grade classroom teacher.

28.     On April 4, 2017 the District added an additional four days to the one-day suspension and explained they were looking for ways to serve D.W.

29.     On April 6, 2017 parents were notified that D.W. would remain out of school until a Manifestation Determination Review meeting could be held on April 17, 2017.

30.     At the Manifestation Determination Review meeting on April 17, 2017, the District purported to determine that D.W.'s throwing a piece of pea gravel at his teacher was a "weapons" offense.

31.     The District unilaterally decided to place D.W. in a 45-day Interim Alternative Educational Setting at a Therapeutic Day School ("TDS"), the Pavilion Foundation School in Champaign, IL.

32.     D.W.'s parents did not accept the proposed placement.

33.     D.W.'s parents, with help from Equip for Equality, tried to reason with the District, pleading that D.W. be allowed to return to the second grade classroom where he was making progress both academically and behaviorally until he was removed illegally from school.

34.     The District refused to allow D.W. to return to school.

35.     As a result, D.W. was not in school during April and May 2017.

36.     The District refused to provide any educational or related services while D.W. was out of school based on this exclusion.

37.     The District failed to conduct D.W.'s required three-year reevaluation during second grade, because he was out of school at the time that the assessment would normally have

been done and the District failed to make alternative arrangements for assessment.

38.     On June 20, 2017, Parents had a neuropsychological evaluation completed at University of Chicago-Medicine.

39.     On August 10, 2017, an IEP meeting was held to discuss services and placement for third grade.

40.     The District changed D.W.'s eligibility to Emotionally Disturbed and insisted that he attend a "Therapeutic Day School" for 3rd grade.

41.     The Parents disagreed, invoked "stay put," and asked for mediation.

42.     On September 5, 2017 mediation was held. No resolution was reached.

43.     On September 6, 2017, D.W. was suspended for 10 days after he tossed two child-sized chairs, which the District also characterized as weapons, in the process of trying to resist restraint.

44.     On September 15, 2017, D.W.'s parents filed for due process, initiating ISBE Case 2018-088.

45.     On September 21, 2017, a Manifestation Determination Review meeting was held. The District unilaterally changed D.W.'s eligibility to Emotional Disturbance and its placement offer to a therapeutic day school, the Pavilion, once again for a "weapons offense," i.e. throwing child-sized chairs.

46.     On September 28, 2017, D.W.'s parents filed an expedited hearing disputing the placement.

47.     Throughout the hearing process, D.W. was out of school. Once again, the District refused to provide any educational or related services.

48.     As part of her decision in the expedited portion of ISBE Case No. 2018-106,

Impartial Hearing Officer Mary Schwartz ordered on November 7, 2017 that D.W. be returned to his stay put placement in public school and that an independent functional behavioral analysis be completed by a mutually agreed upon Board Certified Behavior Analyst ("BCBA").

49.     Instead of returning D.W. to his stay put placement in general education, the District put him in a special education classroom, segregated from the other students in it, where he remained throughout that hearing process.

50.     The independent functional behavioral analysis was completed on December 14, 2017.

51.     A second, non-expedited portion of the hearing was held on December 11, December 12, December 13 and December 18, 2017 and January 11, 2018.

52.     The following were among issues at the second hearing: whether D.W.'s challenging behaviors required an appropriately trained and experienced 1:1 aide to assist in managing those behaviors and, if so, whether the District failed to provide the required 1:1 aide; whether D.W.'s behaviors clearly impeded his learning and, if so, whether the District failed to complete a Functional Behavioral Assessment ("FBA") to address those behaviors; and whether the recommended supports identified in the June 20, 2017 independent neuropsychological evaluation are necessary for D.W. to participate in the recommended LRE and, if so, whether the District failed to develop an IEP on August 10, 2017 that included those necessary supports.

53.     As relief, Parents requested the following: that D.W. be returned to his stay-put placement in the May 18, 2016 IEP or place him in a co-taught third grade classroom in his home school with a 1:1 aide trained in applied behavior analysis ("ABA") and with experience in working with students with developmental delays and aggressive behaviors and small group reading instruction with all the components of an Orton-Gillingham, Lindamood-Bell, or Wilson

Reading program to address D.W.'s specific learning disability in reading and writing. Parents also requested that D.W.'s primary eligibility for special education services be changed from Emotional Disturbance to Other Health Impaired with a secondary disability of Specific Learning Disability.

54.     On January 29, 2018, Independent Hearing officer Mary Schwartz rendered her decision in ISBE #2018-0088.

55.     The hearing officer determined that the District had denied D.W. a free appropriate public education and ordered the following: that the District convene an IEP meeting within 10 school days of receipt of the Order and prepare an IEP that: returned D.W. to his stay put placement, general education classroom with supports and determine D.W.'s eligibility as other health impaired and specific learning disabilities in reading and writing and include the academic recommendations and accommodations in the neuropsychological evaluation report.

56.     The hearing officer further ordered that the IEP include a Non-contingent Reinforcement ("NCR") program in an enriched environment, as described by Dr. Falcomata, the agreed upon independent evaluator, a Board Certified Behavior Analyst (BCBA), as D.W.'s educational program. This program aimed to stop the cycle of challenging behaviors and counterproductive responses by removing demands, escape from which appeared to be the function of challenging behaviors. After a temporary period in which demands were removed and challenging behaviors were eliminated, demands would be carefully and gradually reintroduced. D.W.'s behaviors had arisen and become more severe through several years of mismanagement and required sophisticated interventions by skilled professionals as well as coordination among school and medical service providers.

57.     Additionally, the hearing officer ordered that the District and Parents discuss the

parameters of when restraint could be used and that this information be memorialized in the IEP.

58.     The District appealed the IHO's decision, in a case that is pending as Case No. 2:18-cv-2146, assigned to the Honorable Colin S. Bruce. The District has not fully complied with the decision, and in January 2019 withdrew its compliance altogether, though the decision is binding while the appeal is in progress.

59.     The District essentially ignored the IHO's orders with respect to restraint, claiming to be trapped between the student's pediatrician's reservations about the potential of restraint to increase anxiety, on one hand, and Dr. Falcomata's view that they would sometimes be necessary in implementing the "demand" phase of the NCR program. The District did not memorialize in D.W.'s IEP parameters for use of restraints, as required by the IHO, nor did the IEP team even attempt to work out the difficult issues in serving a student with mental health and behavioral issues who had been traumatized by a history of restraints, seclusion, and exclusion from school. Instead, it stopped restraints for a while, and then reverted to using them excessively and counterproductively. The District did not collaborate with D.W.'s counsellor or developmental pediatrician, nor did it bring in similar expertise, nor did it turn to Dr. Falcomata or anyone else when its novice BCBA's attempt to implement this sophisticated, complex, evidence-based approach to challenging behavior faltered.

60.     In January 2018, IHO Schwartz had required that the NCR program be supervised by a Board Certified Behavior Analyst ("BCBA") who has experience working with and treating students similar to D.W. and who would work with the District to hire a behavior therapist who will work directly with D.W. in the NCR enriched environment.

61.     The Order required the District to hire an experienced BCBA to implement an NCR program per the recommendations of Dr. Falcomata. At the 2/7/18 IEP meeting, Parents'

counsel asked the District to reach out to colleagues of Dr. Falcomata who had experience implementing this program in Illinois, including Dr. Mark Dixon. Although Megan Hunter, a District administrator, testified that she had studied under Mark Dixon and held him in high regard, the special education director testified that she did not reach out to him.

62.     Instead, in or around mid-February 2018, the District hired a Board Certified Behavior Analyst ("BCBA") who had had her BCBA credential for less than a year, had only met requirements to supervise Registered Behavior Therapists ("RBT") within the last six months, and estimated she had worked on three NCR cases, though it was not clear how closely if at all they resembled the centrality of NCR in D.W.'s case. Ms. Northrup testified that she was aware of Ms. Helbig's "experience" as a BCBA and with NCR when she made her hiring decision.

63.     Though the IHO determined that aide training had been deficient, this was not corrected following her decision. The line-staff, Ms. Bottcher, was equally inexperienced as she testified that this was her first job after graduating college and was newly trained as an RBT to work with D.W. in October of 2018. Nonetheless, she testified that she made many suggestions and decisions which Ms. Helbig always supported.

64.     D.W.'s parents quickly voiced concerns that the BCBA hired by the District was insufficiently experienced, and their concerns proved well-founded.

65.     The hearing officer relied in large part on the recommendation of the BCBA-D, Dr. Terry Falcomata, who conducted the independent functional behavioral assessment that was ordered following the first hearing. Dr. Falcomata recommended not merely using noncontingent reinforcement as one tool in behavior management, which is common and familiar, but making it the center of D.W.'s program. He would start with nearly nonstop preferred activities, and no

demands, and reinforcers would be thinned, and demands added, gradually, based on data. Dr. Falcomata recommended that D.W. should be provided with NCR in an enriched environment.

66. According to the NCR plan developed by Dr. Falcomata the BCBA was supposed to do ongoing preference assessments and even use things that D.W. enjoyed at home such as playing Minecraft—instead the BCBA "chose" several tangibles that were "appropriate" for school, extremely limiting D.W.'s "choices" of highly preferred interests.

67. Instead of implementing NCR in the general education classroom or in a special education classroom, the District attempted to implement NCR in the "reset room" in May and June of 2018. This location was unattractive and was historically associated with punishment, and using it for NCR was inconsistent with the goal of changing D.W.'s attitude towards school. D.W. then began 4th grade in the special education classroom with no other peers in the room. About three weeks into the year, peers began coming into the special education classroom to work in small groups with the special education teacher, but D.W. was still segregated by himself; the classroom was divided into 2 sections—one side was for him, his aide, and the behavior therapists implementing his program.

68. The hearing officer ordered that when D.W. was ready to move slowly from the NCR program to a program featuring more academic demands, the IEP team must convene to plan his educational program in conjunction with the behavioral therapist and supervisor.

69. The District and BCBA reported good progress, and the BCBA moved D.W. into a 4th grade general education classroom for science, and then allowed him to choose to remain all day, around the last week of October 2018, shortly before a medical leave by the BCBA, without convening an IEP meeting to discuss this change. This was an abrupt, insufficiently planned transition, done without prior parent knowledge. Following the move, the BCBA

indicated that she had not expected the move to occur so soon and needed to work on designing a schedule that could meet his academic and behavior needs. D.W.'s schedule was unpredictable and fluctuated, triggering anxiety and resistance to transitions. The District had initially implemented NCR in an unnecessarily segregated environment, then abruptly let D.W. shift himself to a busier, more populated environment, with less support. He went from a 3:1 ratio of undivided attention to having his aide remain in the hallway while he was expected to respond appropriately to a classroom teacher responsible for around 27 students. When problems emerged while the BCBA was out on medical leave, the behavior therapist began pulling him into more segregated settings on an ad hoc basis, rather than doing what the protocol required, which was returning to a lower level of task demands.

70.     During the beginning period with NCR, when demands were first introduced, they were deliberately easy to maximize performance and thus reinforcement for on-task behavior and compliance. But in fall 2018, when demands were greatly heightened, insufficient plans were made to provide academic work that he was capable of doing. On the contrary, since he had been given, and had elected, the choice of going into general education for almost the entire day, staff decided it would be wise to "expose" him to unmodified grade level work, and to enforce this exposure by "physical prompting." He could not be forced to read, but he could be, and was, relocated forcibly for not doing so, to the location which had long been associated with consequences for poor behavior. Overly difficult academic work and punishments for noncompliance predictably worsened behavior challenges.

71.     Though IHO Schwartz had ordered that in accordance with Dr. Scott Hunter's recommendation D.W. be provided a small reading group using an Orton-Gillingham-based reading program designed for students with specific learning disabilities, the District instead

used a standard unmodified 4th grade reading curriculum. Since D.W. was reading far below grade level, he found this extremely frustrating, and many of his behavior problems were related to inappropriate reading materials and expectations.

72.     Rather than carefully planning a transition into a less restrictive environment, through an IEP meeting, as ordered by Hearing Officer Schwartz, the District unilaterally implemented changes, which included allowing D.W. to spend far more time in general education suddenly and without appropriate planning for instruction and curricular modifications. Minor problems became more frequent.

73.     Then, in late November 2018, the supervising behavior analyst went on medical leave, which was followed immediately by reports of deteriorating behavior.

74.     As problems occurred, the District failed to analyze data and make necessary adjustments, instead reverting to its long-standing approach to D.W.'s challenging behaviors— thus perpetuating a vicious cycle of misbehavior and punishment that the NCR program was carefully designed to replace. The District took a reference in Dr. Falcomata's report to use of a prompt hierarchy, the last element of which could be physical prompting, as warranting frequent, multi-adult physical coercion of D.W., often for trivial reasons. Rather than revising the behavior plan to deal with the fact that physical "prompts" were not securing desired behavior and were disastrous in terms of rapport and challenging behavior, District staff and consultants escalated their use of physical constraints, including forcing D.W. into a time out room, where he was alone and often extremely agitated. The District escalated its use of an old nurse's office, which it labelled the "reset room," as an isolated time out room. D.W. was regularly secluded—placed in a room alone and kept inside by adults who remained outside the room.

75.     Physical restraint was used to remove D.W. from the special education resource

room for work refusals and other small infractions such as putting his hood up, laying his head down on his desk, and refusing to answer, none of which were emergency situations.

76.     Parents objected in writing and in person during IEP meetings over the course of a year to the District's use of the room, pointing out that it was not safe to use as an isolated timeout room. There was a private bathroom connected to it, the door was solid with no viewing pane, the door could be locked from the inside, there were electrical outlets on all four walls, there was exposed wires on the light switch because there was no cover, there were two thermostats and wire covering on the wall, and there were a metal pole and metal fire alarm box on the wall, all within the reach of students. During due process, the District cited its lack of a more suitable space for seclusion as a basis for removing D.W. entirely from a regular campus.

77.     The District provided protective gear as ordered but the behavior therapists chose not to use any of it.

78.     D.W. was left in the unsafe isolated time out room on numerous occasions during November and December 2018 and January 2019; during these seclusions, he kicked a hole in the wall, ripped the thermostat covering off the wall and broke it, and kicked the metal pole to the fire alarm box, causing sparks to fly, which frightened him.

79.     On December 13, 2018 directly after the incident with the sparks, Parents met with the Superintendent voicing concerns over the District's disregard for D.W.'s safety by continuing to use the room as an isolated time out room and not making the necessary changes to ensure D.W.'s safety.

80.     D.W. was suspended on Friday, December 14, 2018, apparently to give the District time to cover the outlets, move the light switch out of reach and move the fire alarm panel to a different room.

81.     The District failed to cover the hole in the wall and in mid-January D.W. made the hole larger where he was able to access pieces of drywall, wiring, and springs to throw at the door to gain attention to get out of the isolation room. The District finally covered the lower walls with polyurethane in mid-January, rendering the room physically safe to use after a year of voicing concerns.

82.     The District took over a year to make the necessary and rather simple remodels to the "reset room" to remove physical dangers. The District made changes to the room between February 2018 and January 2019, with most of them taking place between December 14, 2018 and January 24, 2019. Changes included a new door with a viewing panel, a new door handle that could not be locked, covering all the outlets with blank plates, locking the bathroom door at all times when D.W. was in there, removing the thermostats from the wall, moving the light switch to an overhead model that came on when you entered the room, moving the metal box and pole that housed the building's fire alarms, and right before the January 24, 2018 IEP meeting covering all four walls with polyurethane so he could not kick holes in the wall anymore. Had the room been made safe to use as an isolated time out room prior to using it then he would not have been able to remove the light switch plate to get the exposed wires, he would not have been able to rip the thermostats off the wall and stomp on them, he would not have been able to kick a hole in the wall and remove debris to throw at the door and ceiling. Had the behavior therapists utilized the protective gear (wearables for arms and legs) it would have reduced the chances of bruises, scratches, and red marks on the adults performing the restraints. The more fundamental problem was the decision to rely on timeout, which had previously been ineffective, and restraints to put and hold D.W. in the timeout setting, which had been traumatizing and counterproductive, rather than fully and adequately implementing the noncontingent

reinforcement program recommended by the agreed-upon expert witness and ordered by the hearing officer.

83.     The District's delay in making the isolated time out room safe, and its excessive use of that room for minor infractions, led to minor injuries such as abrasions, cuts, and bruises to both D.W. and the adults charged with getting him into the room and keeping him there. These injuries were then used by the District to support its proposal to remove D.W. from school on the ground that he was likely to cause injury to himself or others.

84.     On January 10, 2019 the behavior analyst, newly back from leave, moved D.W. back to the "reset room" for NCR and academics because of two "elopements," during which D.W. went to the boys' bathroom and locked himself in a stall to avoid restraints and confinement in the "reset room." He had a desk and chair in the "reset room" to complete worksheets. When he got frustrated and would shut down and refuse to answer or comply (which staff and consultants characterized as signs of escalation) they would remove the desk and chair and leave him alone in the "reset room." He was still able to attend specials like recess, lunch, art, PE, music if he was not in "time out."

85.     On December 17, 2018, D.W.'s parents sought an IEP meeting to deal with the District's escalating use of physical restraints for non-emergency situations.

86.      The requested IEP meeting was finally held on January 24, 2019 and, at that meeting, the District told D.W.'s parents that it was again excluding him from school.

87.     The District stated the BCBA would no longer provide NCR at the school and claimed it was not able to locate another BCBA to supervise D.W.'s program. The BCBA's interpretation of her ethical duties was allowed to displace IDEA's procedures for program change.

17

88.     Parents found a qualified BCBA, Dr. Jennifer Hamrick, who had extensive experience implementing an NCR-based program and supervising trained line staff, who are called Registered Behavioral Therapists. The District refused to contract with Dr. Hamrick or to find any other way to implement an NCR-based program. Nor did it offer a special education class on a regular public school campus, or any alternative behavioral approach.

89.     The District's proposed alternative was to place D.W. at Pavilion, a residential placement, as a day student, and pay current providers to provide NCR in that setting—in sum, to fund continued services by a newly-minted behavior analyst, who appears to have worked on a few cases involving use of noncontingent reinforcement, and not necessarily any in which it was the dominant feature. That BCBA viewed physical "prompting" to enforce compliance as critical to NCR, and was not aware that, as the parents' expert in NCR made clear, once it became clear that physical prompting was backfiring, alternatives needed to be implemented.

90.     That setting, Pavilion, did not feature any Board Certified Behavior Analysts, though students were sent there for challenging behaviors. Aggression by students was common; D.W.'s parents were very concerned about having him in an environment in which he was at risk of seeing, experiencing and possibly beginning to engage in aggression against peers. Their own observations and those of experts persuaded them that Pavilion would be inappropriate academically, and likely disastrous behaviorally and emotionally. If D.W. had attended, an already-crowded, small room would have held 16 people. Students ate lunch in the room, the school did not have a playground, and the classroom was chaotic, with little if any learning going on during their three tours of the facility.

91.     The District insisted on Pavilion despite having collected evidence that NCR was showing good results even with its problematic implementation. According to District records

NCR began on May 7, 2018 and was implemented for a total of 121 days. On approximately 100 of those days, D.W.'s daily behavior charts show zero instances of verbal or physical aggression with adults. During all 121 days during NCR implementation, D.W.'s daily behavior charts show zero instances of physical aggression with peers. Physical restraint was implemented on approximately 11 of the 121 days during which NCR was being implemented.

92.     The District refused to use a highly capable BCBA who was available to take over when its inexperienced BCBA went out on medical leave, insisting instead on removing D.W. from school based on problems that greatly intensified while a line staffer worked with little monitoring and without corrective feedback during her supervisor's medical leave. D.W. has been out of school since January 24, 2019 when the District stated he could not return. This was the third time the District had unlawfully removed D.W. from school.

93.     The District acknowledged that Lincoln Trail was D.W.'s stay put placement but indicated that they did not have a program for him, so he could not come. The District indicated that it would at some point owe compensatory education. D.W.'s parents had no choice but to file for hearing on January 29, 2019; ISBE Case No. 2019-195 was assigned to hearing officer Leah Trinkala.

94.     On or about February 10, 2019, the District filed for an expedited, typically much shorter, hearing, initiating ISBE Case No. 2019-0199.

95.     On or around February 10, 2019, the parents sought an emergency stay put order in Case No. 2019-0195, the parent-filed case, but the IHO incorrectly believed she had no power to order the District to allow the student to return to school.

96.     After the decision in Case No. 2019-0199, which is being contested in this matter, was issued on March 22, 2019, the parents withdrew their own filing and plead with the District

to let D.W. attend another therapeutic day school during the 45-day exclusion. The District refused to allow that.

97.     The District has blatantly disregarded procedural safeguards, the law and IHO orders on 3 separate occasions when they illegally removed D.W. from school and would not allow him to return.

98.     During the past two years, D.W. has lost over 180 days of valuable educational instruction and socialization with peers due to illegal actions of the District.

99.     The District filed a due process hearing around the same time period Parents filed their emergency motion to compel the District to return D.W. to school and implement D.W.'s IEP in his stay put placement as ordered.

100.     This time the District alleged that D.W. was "a danger to himself or others and that injury was likely to occur" if D.W. was left in current placement.

101.     According to District records and Total Spectrum incident reports and behavior charts there were only five instances of minor injuries such as bruises, red marks, and scratches.

102.     D.W.'s developmental pediatrician testified that D.W. was not a danger to himself or others.

103.     D.W.'s educational tutor who spent approximately 4 hours a week for over a year with D.W. testified that he was not a danger to himself or others.

104.     D.W.'s private therapist who he has seen weekly since May 2014 testified that he was not a danger to himself or others.

105.     D.W.'s neighbor of 5 years, a local youth pastor, who has a son the same age and is friends with D.W. also testified that he was not a danger to himself or others.

106.     Parents testified that D.W. was not a danger to himself or others.

107.    The Parents continue to believe that D.W. can and should be educated alongside his peers in his general education placement with appropriate supports as ordered in the two previous hearings in which they prevailed.

## COUNT I

### Against District

### Administrative Review of the Hearing Officer's Decision

108.    The Parents incorporate and restate Paragraphs 1 through 107 above, as though fully set forth herein.

109.    Pursuant to IDEA and Federal Regulations, a free appropriate public education must be available to eligible students. 34 C.F.R. § 300.101.

110.    With regard to educational placement decisions for eligible students, the placement decision must be made by a team of individuals who knows the students and in conformity with the least restrictive environment provisions of IDEA. 34 C.F.R. § 300.116.

111.    The least restrictive environment ("LRE") provisions of IDEA provide that to the maximum extent appropriate, children with disabilities be educated with their nondisabled peers. 34 C.F.R. § 300.114(a)(2)(i).

112.    This provision further provides that "special classes, separate schooling, or other removal of children with disabilities from the regular education environment occurs only if the nature or severity of the disability is such that education in regular classes with supplementary aids and services cannot be achieved satisfactorily." 34 C.F.R. § 300.114(a)(2)(ii).

113.    In reaching her determination that D.W. should be placed in a 45-day interim alternative educational setting (IAES) at the Pavilion Foundation School, the hearing officer did not use the correct standard for determining whether he was a "danger to himself or others and

substantially likely to injure himself or others if left in his current placement."

114.    In support of her claim that D.W. should be placed in a 45-day IAES, the hearing officer relied in part on testimony from District and contracted staff whose testimony stated that only very minor injuries such as bruises and scratches were incurred on only five occasions.

115.    Dr. Falcomata recommended that D.W. receive NCR in the school environment.

116.    District statement that they implemented NCR with fidelity and an "all hands on deck" philosophy is contrary to District and contracted staff's testimony and their insistence that NCR take place "in a vacuum" in the "reset room" further isolating D.W. from his peers and depriving him of the opportunity to acquire further social skills. Both Dr. Falcomata's and Dr. Hunter's report indicated the need for D.W. to continue to be with his peers.

117.    It is the Parent's position that the use of NCR in the classroom in his home school with appropriate supports in place is appropriate in the public school setting.

118.    Notwithstanding this concern, the hearing officer determined that the District could meet its responsibilities by offering to implement NCR—with the same ineffective providers—in a "therapeutic" school without relevant expertise or training.

119.    The hearing officer erred in the following respects:

    a.    The hearing officer failed to take into account strong evidence that requiring the District to fully comply with the January 2018 order by IHO Mary Schwartz would have been a less restrictive way for the District to protect the safety of D.W. and others at his public school.

    b.    The hearing officer allowed the District to relegate D.W. to Pavilion even though there was essentially no evidence that it could provide a free appropriate public education.

c.  The hearing officer allowed the District to outsource D.W.'s education to Pavilion even though it would not have resolved existing safety concerns and would have created new concerns.

d.  The hearing officer allowed the District to take advantage of problems it had created by inadequately providing, and then abruptly stopping, the behavioral program ordered in January 2018.

e.  The IHO misunderstood and ignored expert testimony regarding NCR in theory and as applied to D.W.

f.  The hearing officer erred by exaggerating the risk of physical injury. For more than six months D.W.'s NCR program was implemented with no significant, verified injuries. Significantly, no peers were ever physically injured by D.W. during this entire school year. The only slightly contrary testimony in this regard was that D.W. either bumped or shoved a student in the hallway, with Ms. Bottcher testifying that it was likely a bump and no action was taken against D.W.  Even after Thanksgiving, when the BCBA was on leave and D.W.'s behavior deteriorated, there is no documentary evidence of a single injury that required medical treatment. Corina Bottcher testified that following one incident she discovered, after going home that evening, that she had injured her knee while restraining D.W. and had a "possible" meniscus tear. At the January 24, 2019 IEP meeting, Parents requested records from the District to confirm this claim, but none were provided or submitted into evidence in this hearing. In all of the incident reports prepared by Ms. Bottcher, she never checked that, "I

am planning on seeking medical treatment and wish to fill out a worker's

compensation form." The reports also consistently indicated that she never

called 911. As for D.W., his injuries were similarly minor. He never

required medical treatment and only once received a band-aid for a small

cut on his finger. All of the testimony indicated that D.W. does not exhibit

self-injurious behavior nor was he ever hospitalized for such ideation.

g. The IHO ignored the fact that the risk in this case—of minor injury, to the

student or adults who attempt to restrain him—would occur in any setting,

likely to a greater degree in a setting which lacked the parts of school that

D.W. enjoyed and the nondisabled peers with whom he interacted

harmoniously during lunch, recess and "specials." The risk of minor

physical injury is not dependent on setting, but on a novice BCBA's

misinterpretation of the program she was contracted to provide, and lacked

skills to update, coherently critique, or even coherently explain. Nothing

in IDEA or Illinois law says that injuries are less severe if they occur out

of the proximity of nondisabled students and their teachers and

parents. The District's plan—upheld by the hearing officer—to send the

same consultants into a more restrictive environment would have deprived

D.W. of educational benefit while aggravating risks of minor injury to him

and to consultants given carte blanche to restrain and seclude him.

120.    In reaching this determination, the hearing officer disregarded testimony from

D.W.'s educational tutor, Hillary Veitch, who worked with D.W. for over a year, stating D.W. is

not a danger to himself or others.

121.    In reaching this determination, the hearing officer disregarded testimony from D.W.'s developmental and behavioral pediatrician, who has been treating him since he was five years old.

122.    In reaching this determination, the hearing officer disregarded testimony from D.W.'s private therapist, who has been treating him for a year, and whose views were consistent with those of his previous therapist.

123.    In reaching this determination, the hearing officer disregarded testimony from D.W.'s neighbor and local youth pastor, who has known him for over five years.

124.    The hearing officer inappropriately determined that D.W.'s behavior required him to be removed from his "stay put" placement as determined by previous DP Decision 2018 DP 0088.

## COUNT II

### Against District

### Violations of Section 504 of the Rehabilitation Act of 1973

### (Jury Trial Requested as to § 504 Claims)

125.    The Parents incorporate and restate Paragraphs 1 through 124 above, as though fully set forth herein.

126.    Section 504 requires that districts provide a free appropriate public education to school-age children, by meeting their needs as adequately as they meet the needs of students who are not disabled.

127.    Mahomet-Seymour is an excellent school district that provides outstanding education for nondisabled students. Because of his disabilities, D.W. has been excluded from, segregated within, and inadequately educated within the District.

25

128.     The District's acts and omissions as described herein have denied D.W. meaningful access to the benefits of a public education. The District has failed to provide D.W. with sufficient educational programs with appropriate accommodations and modifications based on his disability, and failed to meet his needs as adequately as the needs of nondisabled students are met by the District. As the District acknowledges, he has failed to make academic progress.

129.     Though the District prides itself on excellent programs with high student success rates, staff have demonstrated deliberate indifference, within the meaning of Section 504, to D.W.'s needs and the District's legal obligations. The result is that his prospects for short- and long-term educational success, success in adult roles, independence in activities of daily living, positive interpersonal relationships, and short- and long-term personal satisfaction have been sharply reduced and that his parents in the long-term are likely to experience significantly increased financial burdens as a result of the District's acts and omissions.

## COUNT III

### Against Christine Northrup

**Individual Liability for Substantive and Procedural Violations of Individuals with Disabilities Education Act with remedies sought pursuant to 42 U.S.C. § 1983**

**(Jury Trial Requested as to § 1983 Claims)**

130.     The Parents incorporate and restate Paragraphs 1 through 129 above, as though fully set forth herein.

131.     District Special Education Director Christine Northrup was aware that the NCR program that IHO Schwartz had ordered for D.W. was complex and would require frequent adjustments by an experienced, capable provider.

132.     District Special Education Director Christine Northrup was aware that the

26

District's prospects upon appealing IHO Schwartz's order might be undermined if D.W. was successful with the services provided.

133.    District Special Education Director Christine Northrup was aware that barring D.W. from further school attendance, beginning January 24, 2019, based on a particular provider's unwillingness to continue serving him on a school campus, was unlawful, if an alternative provider was available. She appears to have believed that the worst thing that could happen if a disabled student was thrown out of school—regardless of how devastating this might be emotionally and financially—was that he would eventually be entitled to compensatory education.

134.    District Special Education Director Christine Northrup appears to have been aware that a provider was available who would be more available physically than its preferred provider had been for the previous two months, who would be extremely available by phone and video, and who had far more experience with NCR-based programs.

135.    District Special Education Director Christine Northrup declined to hire an available provider, instead barring D.W. from school.

136.    District Special Education Director Christine Northrup became aware following the hearing decision that the family was willing to accept a therapeutic day school placement on a temporary basis—one on which it had presented virtually no evidence at hearing, and which would cost the District no more.

137.    District Special Education Director Christine Northrup knew before hearing that the family was extremely unlikely to accept a placement at Pavilion, based on family and professional observations. Nonetheless, that was the only setting about which the District offered enough service that the IHO thought she could order it.

138.    District Special Education Director Christine Northrup learned shortly following the hearing that, even though Parents disagreed with the IHO's decision, in an effort to get D.W. back into school they would accept Circle Academy as an interim placement. But she refused to make it available as a 45-day interim alternative setting.

139.    Though District Special Education Director Christine Northrup agreed with staff that NCR was not appropriate for D.W., she led an IEP and legal process in which the District argued that NCR was "appropriate" because a hearing officer had ordered it over a year before, and which failed to generate alternative recommendations, instead suggesting that NCR be done at Pavilion, by providers who deemed it inappropriate for D.W.

## PLEA FOR RELIEF

140.    Wherefore, Plaintiffs request that the Court provide the following relief:

a.    Receive and review the records of the administrative proceedings from the Illinois State Board of Education;

b.    Hear additional evidence from the plaintiffs as provided for in Section 1415(i)(C)(ii) of IDEA;

c.    Reverse the Hearing Officer's decision and order;

d.    Enter an order finding, based on the preponderance of the evidence, that the District willfully and blatantly removed D.W. from his "stay put" placement at Lincoln Trail Elementary and denied him a FAPE;

e.    Reverse the hearing officer's decision and order D.W. to be returned to his "stay put" placement at Lincoln Trail Elementary;

f.    Order the District to continue the NCR program with a mutually agreed upon BCBA with a minimum of 5 years' experience implementing and

supervising RBT's;

g.  Order the District to hire at minimum 1 registered behavior therapist with at least three years of experience working with children with developmental delays and challenging behaviors similar in nature to D.W.;

h.  Order the District to hire a 1:1 aide with a minimum of three years' experience in working with students similar in nature to D.W.;

i.  Order the District to pay for the 1:1 aide and all staff working with D.W. to have advanced training in de-escalation techniques by a mutually agreed upon highly qualified source outside of the District;

j.  Order the District to continue to pay for a minimum of 4 hours of tutoring per week for the next 5 years to aide D.W. in closing the gap of losing over 180 days of instruction;

k.  Order the District to fund counselling to address "private events" which it blames for behavior problems, and to coordinate behavioral and mental health treatment.

l.  Order the District to hire or pay for training at least one of D.W.'s teachers in an Orton-Gillingham-based Reading Program to address D.W.'s SLD in reading and writing;

m.  Order the District to memorialize the parameters of using restraint in D.W.'s IEP with emphasis on *emergency situations only* and developing definitions which are also to be included in the IEP;

n.  Award damages to student and parents according to proof for discrimination based on disability contrary to Section 504 of the

Rehabilitation Act of 1973.

o.  Award damages to student and parents according to proof of violations of

42 U.S.C. § 1983.

p.  Award other relief that the Court deems appropriate.


Respectfully submitted,                    By: /s/ Maureen Graves
                                               Attorney for Parents